## COWLES & CO. *v.* RICKETTS:

The word "assignment" has acquired a peculiar and appropriate meaning·
in law, is a technical word, and must be construed according to that peculiar
and appropriate meaning.

Section 977 of the Code, which provides that "no general assignment of prop-
erty by an insolvent, or in contemplation of insolvency, for the benefit of
creditors of the assignor, shall be valid, unless it be made for the benefit of
all his creditors in proportion to the amount of their respective claims," im-
plies a trust, and contemplates the intervention of a trustee.

A transfer by an insolvent debtor of all his property, in actual payment on.
discharge of a pre-existing debt, he having other creditors known to the·
transferee, is not fraudulent *per se;* nor is such a transfer prohibited by·
section 977 of the Code.

And such a transfer, unaccompanied by actual fraud, is valid as against other
creditors of the transferer.

*Appeal from the Dubuque District Court.* ·

THIS was an action of replevin, to recover certain goods
from the possession of the defendant, who, as sheriff of Du-
buque county,. had attached the same, as the property of
one Russell, to secure a demand in favor of one Mobley..
The plaintiffs claim by virtue of a sale by Russell, made to
them on the 26th day of March, 1855 ; the attachment hav-
ing been levied on the 29th.

The answer states the authority of defendant. to attach,.

Cowles & Co. v. Ricketts.

avers the property was subject to the attachment, and that any claim of plaintiffs in the replevin was in fraud of plaintiff in the attachment.

This is specifically denied. Trial by jury. The evidence adduced by plaintiff shows, that James H. Russell had formerly occupied the room on the corner of Second and Main streets, in the city of Dubuque, and was the owner of the stock of goods therein; that on the 26th day of March, 1855, said Russell being indebted to the plaintiffs in about the sum of six thousand dollars, for goods, wares, and merchandise before that time purchased of them, most of which was due, and some of which had been due for some time, and said plaintiffs being at that time pressing said Russell for payment of said debt, the said Russell did thereupon, on said 26th of March, sell out his entire stock of goods in said store-room contained, to the plaintiffs, in part payment of the said indebtedness, and took the plaintiffs' receipt for the same; that said Russell gave possession of said store-room and stock of goods to the plaintiffs, and since that time, has had no interest in, nor exercised any control over, the same. A bill of sale, containing an inventory of the goods, was given by Russell to plaintiffs, and payment for the same acknowledged by the receipt thereon, March 26th, which was also in evidence.

It was shown by cross-examination, that Russell was indebted in New York, in the sum of eight hundred dollars, not due, and to Mordecai Mobley, in Dubuque, over two hundred dollars, which was due, and that said indebtedness was known to plaintiffs; that said Russell at the time of said sale, was insolvent, and that his insolvency was known to plaintiffs; that said Russell was also indebted to his father-in-law, for payment of which indebtedness, he turned out some household furniture; that by the terms of said sale to plaintiffs, it was absolute; that no interest remained in said Russell; that his sign was taken down on the morning of the 27th of March, 1855; and that plaintiff had leased the store-room of the owner of the same, on the morning of the 27th of March. This was the substance of all the testimony

offered.    The defendant moved for a nonsuit, which was granted, on the ground that the sale was in fraud of creditors and void.    The plaintiffs then moved for a new trial, for several causes, which are all substantially involved in these two, namely; that the court erred in not allowing the jury to pass upon the evidence, and in declaring the sale void as to defendant.

*Hand & Covil*, for the appellants, relied upon the following authorities: *Merrit* v. *Lyon*, 3 Barb. 111; *Osborn* v. *Moss*, 7 Johns. 163; 1 Cow. Treatise, 492; *Blank* v. *German*, 5 Watts & S. 42; *Dana* v. *Bank of United States*, 5 Watts & S. 250; *Atkinson* v. *Tomlinson*, 1 McCook, 238.

*Clark & Bissell*, for the appellee, cited 11 Verm. 621; 5 Humph. 502; 5 How. (Miss.) 495; 7 Gill & J. 78; 10 Peters, 319; 2 Watts, 347; 1 Watts, 433; 2 Blackf. 26, 151; 3 Marsh. 337; 1 Wash. 203; 7 Watts, 107.

ISBELL, J.—Several questions are raised by counsel for appellants in this case, the primary of which is, was the transfer made by Russell to the plaintiffs, constructively fraudulent?    We say constructively, for if fraud in fact, or actual fraud, need be shown, it was clearly the duty of the court to let the cause go to the jury, that it might determine whether such fraud did or did not in fact exist.    The determination of this question, involves a construction of section 977 of the Code, which provides that "no general assignment of property by an insolvent, or in contemplation of insolvency, for the benefit of creditors of the assignor, shall be valid, unless it be made for the benefit of all of his creditors, in proportion to the amount of their respective claims."

On the part of the defendant, it is insisted, that the word assignment in this statute, includes *sale;* that the intent of the legislature was, that insolvent debtors should distribute their effects with an even hand; and that if the statute is not so construed, the end of its enactment will be defeated,

by insolvents always selling, and never assigning. While it might be very desirable that the effects of an insolvent debtor should be divided among his creditors *pro rata*, without permitting any preference or advantage to any one above another, yet has the legislature attempted, by this statute, to provide a means of enforcing this ideal equity, to the extent claimed? We are clearly of the opinion, that it has not.

In giving construction to the word assignment, as used in the statute, we must be governed by the ordinary rules of construction. The word assignment, is one which has acquired a peculiar and appropriate meaning in law; it is a technical word; and must be construed according to that peculiar and appropriate meaning. Code, § 26. The common law definition of an assignment is, " the transferring and setting over to another, of some right, title or interest in things, in which a third person, not a party to the assignment, has a concern and interest." 1 Bac. Abr. 329. But, again, it is a rule equally imperative, that this word must be construed in accordance with the context. The language, no general assignment of property by an insolvent, or in contemplation of insolvency, *for the benefit of creditors*, to our minds clearly implies a trust, and contemplates the intervention of a trustee, which is incompatible with the idea of a sale absolute. Again: the general policy of the law, may have great weight in determining the true intent of the legislature in this enactment. The maxim of the common law has ever been as between creditors, in securing their dues, *qui prior est tempore potior est jure*.

But how stands our statute law, in relation to this subject? Chapter 76 of the Code, provides for the sale or mortgage of personal property, where the vendor or mortgagor retains possession; and by section 1195, it is provided, that when " the entry shall be made in the entry book of the recorder; the sale or mortgage shall be deemed complete as to third persons, and shall have the same effect, as though it had been accompanied by the actual delivery of the property so sold or mortgaged. No exception is here alluded to, in case

the mortgagor is insolvent.   And it has been the constant every-day practice, to give validity to such transfers of property, unaccompanied with *actual* fraud, notwithstanding the insolvency of the vendor or mortgagor, which would clearly violate the principle contended for here, by defendant.    It is, also, the every-day practice to give validity to the first attachment, and the first execution levied on goods; the lien of the first judgment on real estate; and all of this, notwithstanding the known inability of the debtor to discharge all of his debts.    Not only this, but by a recent enactment (Session Laws, 1853, 143), if a debtor has property exempt from execution, which he refuses to give either in security or payment of his debts, he is liable to the process of attachment.    Now, it would seem, that this enactment contemplated a right in a debtor to pay his debts in property, in good faith.    Nothing is said as to the solvency of the debtor, and we should hesitate to say, that a debtor, if unable to pay all his debts, should be precluded from the benefit of this law, to avoid costs, and the injury to his credit by being attached; or, on the other hand, that an attachment levied on such debtor's property, in case of refusal to give it in payment or security, should not have a precedence of lien over other creditors, not so vigilant in making collection.    But in case such attachment would be valid, and the debtor not have the right to voluntarily pay the debt with his property, it would involve the absurdity, that a debtor might be compelled by the law to pay a creditor, which he would not, by the law, be *permitted* to pay voluntarily.   We conclude that the construction contended for, is not warranted by the words, the context, or the general policy of the law.

At common law, a debtor may prefer any one of his creditors by payment of his debt, or by conveying, in trust, so much of his property as will be sufficient for that purpose. *Widgrey* v. *Haskill*, 5 Mass. 144; *Hatch* v. *Smith*, 5 Ib. 42; *Stephen* v. *Bell*, 6 Ib. 339; *New England Insurance Company* v. *Chandler*, 16 Ib. 275.

We hold that the former branch of this proposition, is not

changed by the statute under consideration.    The latter, is
so far changed by the statute, that a general assignment of
the property of an insolvent, or one which is made in con-
templation of insolvency, is of no validity, unless made for
the benefit of all the creditors of the insolvent, in proportion
to the amount of their respective claims.    Assuming that
the evidence in this case, is true, was the transfer by Russell
to plaintiff, a payment? That it was substantially so, there
can be but little doubt.    The transfer was absolute.    There
is no attempt to show that it was accompanied with any
secret trust:    No interest remained in Russell.    Possession
was given to plaintiffs.    The consideration is not attempted
to be shown as inadequate; and the clear inference from all
the evidence is, that the goods went in discharge of the ex-
isting liability of Russell to plaintiffs, at their full value.
But these, and the like considerations, were properly refer-
able to the jury, to determine whether the transfer was
fraudulent in *fact*.

We have considered the case, with a view only to the
question, whether a transfer by an insolvent of all his prop-
erty, in actual payment or discharge of a pre-existing debt,
he having other creditors known to the transferee, is fraudu-
lent, *per se*.    Whether fraud, in *fact*, existed, will still be a
question, in case the cause is brought to a hearing.    Holding,
as we do, that such transfer, unaccompanied with actual
fraud, is valid as against other creditors of the transferer,
we conclude, that the court erred in not allowing the case
to go to a jury, and that, therefore, the judgment must be
reversed.